J-A10032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TERRENCE JAMES ZANCHUCK :
:
Appellant : No. 849 EDA 2024

Appeal from the Judgment of Sentence Entered July 31, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0000711-2020

BEFORE: PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED SEPTEMBER 23, 2025**

Appellant, Terrance James Zanchuck, appeals the judgment of sentence imposed by the Court of Common Pleas of Delaware County after the court found him guilty of three counts each of aggravated assault and assault of a law enforcement officer, and single counts of possessing an instrument of crime, possession of a firearm by a prohibited person, and terroristic threats.[1] On direct review, he challenges the sufficiency of the evidence for his assault of a law enforcement officer convictions and the denial of his pre-trial motion to dismiss pursuant to Pennsylvania Rule of Criminal Procedure 600. Upon review, we remand this matter for the limited purpose of allowing the trial

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a)(6), 2702.1(a), 907(a), 6105(c)(4), and 2706(a)(1), respectively.

court to correct patent and obvious errors in its sentencing order and affirm Appellant's judgment of sentence in all other respects.

On December 21, 2019, Patrolman Louis Stackeni of the Bethel Township police department surveilled an area on Garnet Mine Road in Bethel Township based on numerous reports of shots fired at that location. *See* N.T. Trial, 4/11/23, 21-22. The next day, Patrolman Stackeni was advised of more shots fired from Appellant's home at 1589 Garnet Mine Road. *See id.* at 23. The patrolman had known Appellant from previously responding to his home in 2016, at which time the patrolman and his fellow officers sought an involuntary commitment of Appellant and recovered some hunter-style rifles from him. *See id.* at 23-24, 46. Based on his prior experience with Appellant, Patrolman Stackeni made sure his fellow officers, responding on December 22, 2019, were outfitted in body armor. *See id.* at 24.

Patrolman Stackeni arrived at the location, in uniform, in a marked police SUV. *See* N.T. Trial, 4/11/23, 24-25, 66. Patrolman Derek Klinger along with Officer Mikey LoJohn of the Bethel Township Police and Patrolman Christopher Gaspari of the Upper Chichester Township Police arrived at the same time in separate patrol SUVs. *Id.* at 63, 65-66, 92-94. The officers stopped approximately twenty meters from Appellant's home and waited to make contact with him. *See id.* at 30, 67. Patrolman Stackeni identified himself as a police officer, announcing his first name, thinking that Appellant would possibly remember him from their prior encounter. *See id.* at 30. After there was no response for three to four minutes, Officer Klinger knocked on

the door to Appellant's home while Patrolman Stackeni provided him "cover" from behind Appellant's truck parked in front of the home. *See id.* at 31, 68. Officer Klinger knocked on the door six to eight times with no response before the officers and other responding colleagues retreated back to their patrol cars. *See id.* at 33, 69.

Two to three minutes later, Appellant exited the door to his home, walked down some stairs, and said, "Who['s] there?" *See* N.T. Trial, 4/11/23, 70. Officer Klinger, who was adjacent to his patrol vehicle, told Appellant that he would like to talk to him about shots fired in the area. *See id.* at 70-71. Appellant said, "Get off my property," and returned into his home. *Id.* at 71, 94-95. Appellant came back outside two more times and, when Officer Klinger tried to talk to him, Appellant twice told him, "[N]o, get off my property." *Id.* at 72. After Appellant exited his home for a fourth time, he said, "If yo[u] guys don't get off my property, I'm going to shoot the shit out of you guys." *Id.* at 73, 95, 123. Appellant then entered his home again. *Id.* at 74, 123. The officers outside the home were then joined by an additional officer, Mark Townsend, who Officer Klinger instructed to go to the rear of Appellant's home. *Id.* at 74.

At that point, Patrolman Stackeni was on the passenger side of the lead police car, Officer Klinger was right behind Patrolman Stackeni, Officer LoJohn was at the rear of the lead car, Patrolman Gaspari moved to two trees on the left side of Appellant's home about twenty-five yards from the home, and another officer, Patrolman Frank D. Gilmore of the Upper Chichester Township

Police Department, arrived on the scene and was behind the officers near the lead car, on the passenger's side of a different patrol car. **See** N.T. Trial, 4/11/23, 35, 76, 96, 106, 122-24.

Using what sounded like a high-power rifle, Appellant fired a first shot off his back porch/deck from around the corner of his house at 8:41 p.m.[2] **See** N.T. Trial, 4/11/23, 33, 76-78, 96, 126. Officer Klinger and Patrolman Stackeni were both outside their patrol car at that time. **See id.** at 33-34. Appellant came out the main entrance of his home and told the officers, "Get the fuck off my area, I'm going to kill you guys." **Id.** at 34-35, 59; **see also id.** at 44 ("Get the hell off my property, or I'll shoot you all."). Officer Stackeni saw that Appellant had either a cellular phone or a small handheld camera in his hand and no weapon. **See id.** at 34. Patrolman Stackeni tried to identify himself to Appellant, but Appellant went back into his house. **See id.** at 35.

After fifteen or twenty minutes, Appellant fired another shot from his back deck. **See** N.T. Trial, 4/11/23, 36, 76, 96, 126. Patrolman Gilmore heard that shot "traveling at a high speed through the tree line" to the right of the officers and into a wooded area. **Id.** at 127. By that time, nearby residents had been evacuated. **See id.** at 36, 79. Appellant came back out, holding a rifle pointed down. **See id.** at 37. Patrolman Stackeni could see that the "bolt was open" on the rifle, *i.e.*, it was "not ready to be fired." **Id.**

---

[2] Appellant was not allowed to possess firearms after his prior involuntary commitment in 2016. **See** N.T. Trial 4/11/23, 47.

Patrolman Stackeni called out to Appellant, but Appellant returned to his back porch.  *See id.*

After fifteen to twenty-five minutes passed, Appellant fired a third shot from a southwest corner bedroom of his home.  *See* N.T. Trial, 4/11/23, 38, 79, 102.  Patrolman Gaspari reported over his radio that he believed that shot was meant for him.  *See id.* at 38-39, 128.  Patrolman Gaspari felt debris from the shot hit him on the back of his head.  *See id.* at 98.  After first making himself narrow behind the tree that he was using for cover, Patrolman Gaspari ran to his left and jumped over a retaining wall for better cover, before trying to work his way back closer to where he had been originally.  *See id.* at 99-100.

About twenty minutes after Appellant fired the third shot, he exited his home with a rifle in his hand and started walking down his driveway, towards the officers.  *See* N.T. Trial, 4/11/13, 80, 129.  The officers tried to address him and tell him to put down the rifle and talk to them, but Appellant instead went back to and through the front door of his home, leaving the door open.  *See id.* at 80-81, 130.  Appellant then fired a fourth shot from a concealed position in the doorway of the entrance of his home.  *See id.* at 40, 81, 100, 131.  That shot went straight between Patrolman Steckeni and Officer Gilmore, striking the tire and undercarriage of the patrol car between Patrolman Steckeni and Officer Gilmore, and next to Officer Klinger, about two or three feet away from Patrolman Steckeni and three to four feet from Officer Klinger.  *See id.* at 40-41, 57, 81, 87, 90, 97, 131-32 (Patrolman Gilmore: "I felt the

impact of that round on the vehicle I was using for cover… [I] kept hearing the hissing, and then realized that it was coming from the tire, the rear tire on the passenger's side."), 144 (description of a photograph showing the flattened tire).  Officer Gilmore's left leg was within one foot of the tire that the fourth gunshot hit.  *Id.* at 132.



*See* Commonwealth Exhibit C-4, Hand-drawn Scene Diagram (bottom portion cropped off); N.T. Trial, 4/11/23, 84 (Officer Klinger noting that Commonwealth Exhibit C-4 showed where he "backed off" after the fourth shot); *id.* at 87 (Officer Klinger identifying "car 4" as the vehicle that was

struck by the fourth gunshot); *id.* at 135-36 (Officer Gilmore reviewing his position in the diagram at the time of the fourth gunshot).

After the fourth gunshot, Appellant pulled the barrel of his gun into the front door of his home and closed the door. *See* N.T. Trial, 4/11/23, 41. Patrolman Steckeni asked the remaining officers to start falling back and an armored SWAT vehicle transported the pinned down officers away from the front of Appellant's home. *See id.* at 44, 113. After SWAT officers moved in, Appellant pointed a hand-held cellphone or flashlight toward the officers from his deck before reentering his home. *See id.* at 45, 82, 133.

SWAT officers formed a ring outside Appellant's house with their armored vehicles. *See* N.T. Trial, 4/11/23, 115. They made contact with Appellant by telephone but had no success in trying to negotiate his exit from the home. *See id.* The SWAT team then initiated a plan to drive Appellant from the home by using an irritant gas. *See id.* at 116. They shot out his windows with less-lethal 40-millimeter grenades to introduce the gas into the home. *See id.* at 116-117. The plan had the desired effect as it caused Appellant to exit the front of the home. *See id.* at 117. Appellant went back into the home but again returned outside to sit on a chair. *See id.* The SWAT officers took him into custody. *See id.*

During the ensuing crime scene investigation and execution of a search warrant at Appellant's home, the police recovered, *inter alia*, a fired cartridge casing from in front of a closet in the master bedroom, another fired cartridge casing from next to the door of the master bedroom, a Remington 700 "three

ought six type" rifle with a scope that was positioned next to a night stand in the master bedroom, three live rifle rounds that were on the nightstand, a flash light from the middle bedroom of the home, a fired cartridge casing from a trash can in the bathroom, a fired cartridge casing that was found in the living room in front of a couch, a 50-caliber long rifle from another bedroom, some shotgun barrels and a partial box of ammunition from the same room where the 50-caliber rifle was recovered, and two live rounds of ammunition that were on a fireplace in the living room. *See* N.T. 4/11/23, 141-44, 151-52. The police determined that the recovered fired cartridge casings had all been fired with the recovered Remington 700 rifle. *See id.* at 151-52. The police were unable to locate any fired projectiles during their search of the area surrounding Appellant's house. *See id.* at 147.

On September 9, 2022, Appellant filed a motion to dismiss pursuant to Pennsylvania Rule of Criminal Procedure 600(d)(1). He reasoned that, even accounting for excludable time due to COVID-19 pandemic-related delays and delays conceded by the defense, his adjusted run date for Rule 600 purposes should have been May 2, 2022 (*i.e.*, 365 days to be tried plus 495 days of conceded excludable time). *See* Motion to Dismiss, 9/9/22, ¶¶ 8 (noting arrest date of December 23, 2019), 11 (concession as to five days of delay attributed to a lack of defense counsel between March 11-16, 2020), 12 (concession as to excludable time with respect to COVID-19 pandemic-related delay between March 16, 2020, and July 19, 2021). Trial had been scheduled for April 23, 2021, but was continued to October 12, 2021, and then continued

to March 14, 2022. *See id.* at ¶¶ 14-15. Appellant noted that, for reasons "unknown" to his counsel, he was ordered to undergo a psychological and competency evaluation in between the continuance from an October trial to a March trial. *Id.* at 16. Afterwards, the trial date was continued to April 25, 2022, and Appellant admittedly waived the delay for Rule 600 purposes between March 14, 2022, to April 25, 2022. *See id.* at ¶ 17. Adjusting for that additional forty-two days of excludable time, Appellant reasoned that his mechanical run date was extended to June 13, 2022. *See id.* at ¶ 18. Appellant conceded that a subsequent delay of fifty-one days between April 25, 2022, and June 15, 2022, was excludable time due to his filing and withdrawal of a motion to suppress evidence. Adding in that delay, Appellant reasoned that his final run date was August 3, 2022, and sought dismissal on September 9, 2022, before trial commenced.

A decision on the Rule 600 motion does not appear on the trial court's docket. The trial court informs us, in its Rule 1925(a) opinion, that it denied the motion "from the bench at a later listing," but that it was "unable to locate a copy of a signed order" to that effect. Trial Court Opinion, 8/13/24, 5. The trial court also notes in its opinion that it denied the motion due to Appellant's "erroneous calculation of the Covid-19 [e]mergency being lifted on July 19, 2021," rather than on "the actual lifting date of August 31, 2021." *Id.* at 6. Reasoning that Appellant miscalculated an additional 43 days of excludable time based on this "erroneous calculation," the trial court concluded that the mechanical run date should have been September 15, 2022, and had not

- 9 -

elapsed at the time of the filing of Appellant's dismissal notice. ***See id.*** The court notes in its opinion that Appellant did not file any subsequent dismissal motions pursuant to Rule 600. ***See id.***

On April 11-12, 2023, Appellant waived a jury and proceeded to be tried by the trial court, after which the court found him guilty of the above-referenced offenses.[3] ***See*** N.T. Trial, 4/11/23, 8-16; N.T. Trial, 4/12/23 4-5. Sentencing was deferred for the preparation of a pre-sentence investigation report. ***See*** N.T. Trial, 4/12/23, 5. On July 31, 2023, the court denied a post-trial motion for arrest of judgment on the assault of a law enforcement officer convictions, in which Appellant sought relief on evidence sufficiency grounds and alleged a supposed lack of evidence to prove his specific intent for those crimes. ***See*** N.T. Sentencing Hearing, 7/31/23, 3-11; Motion in Arrest of Judgment, 4/21/23, 1-6; Supplemental Motion in Arrest of Judgment, 6/28/23, 1-3. On the same date, the court imposed an aggregate term of *at least* twenty to forty years' imprisonment; due to ambiguity in the court's sentencing order the overall length of Appellant's aggregate sentence scheme is unclear.[4] ***See*** Order (sentencing), 7/31/23, 1-3; ***see also*** N.T. Sentencing Hearing, 7/31/23, 24-25.

---

[3] The assault of a law enforcement officer and aggravated assault charges were with respect to Patrolmen Klinger, Stackeni, and Gilmore. ***See*** N.T. Trial, 4/12/23, 4.

[4] The aggregate sentence included three concurrent mandatory minimum imprisonment terms of twenty to forty years' for the three counts of assault
*(Footnote Continued Next Page)*

- 10 -

of a law enforcement officer and three concurrent imprisonment terms of one to two years for the three counts of aggravated assault. *See* Order (sentencing), 7/31/23, 1-2; *see also* 42 Pa.C.S. § 9719.1 (mandating an imprisonment term of "not less than 20 years" for assault of a law enforcement officer under 18 Pa.C.S. § 2702.1(a)(1)).

As will be addressed *infra*, the sentencing order contains ambiguity as to the order of service for the three other terms of imprisonment imposed by the trial court for the remaining offenses, which the trial court will need to address during further proceedings.

For possessing an instrument of crime, the court imposed two and one-half to five years' imprisonment "consecutive to C[ount] 13," the first count of assault of a law enforcement order, but "concurrent C[ounts] 14-15, [and] 5-7," the remaining two counts of assault of a law enforcement assault and the three counts of aggravated assault. *See* Order (sentencing), 7/31/23, 2. This service-of-term designation is impossible to enforce because the imprisonment terms for Counts 5-7 and 14 were already imposed to be served concurrent with the term for Count 13 so the imprisonment term for possessing an instrument of crime could not be served both consecutive to Count 13 and concurrent with Counts 5-7 and 14-15.

For possession of a firearm by a prohibited person, the court imposed two and one-half to five-years' imprisonment to be served "consecutive to C[ount] 13 [and] concurrent to C[ounts] 14-15, [and] 5-7," without reference to how the Section 6105 term would be served with respect to the Count 23 term for possessing an instrument of crime. *See* Order (sentencing), 7/31/23, 3. As with the possessing an instrument crime term of imprisonment, the imprisonment term for possession of a firearm by a prohibited person could not be served both consecutive to the imprisonment for the first count of assault of a law enforcement officer and concurrent with the imprisonment terms for the two remaining counts of assault of a law enforcement officer and the three concurrent terms for aggravated assault.

For terroristic threats, the court imposed three to seven years "concurrent to C[ounts] 13-15[,] 5-7[,] 23 and 24." *See* Order (sentencing), 7/31/23, 3. This service-of-term designation is impossible to enforce because this imprisonment term could not be both concurrent with both the three concurrent terms of twenty to forty years' imprisonment for assault of a law enforcement officer and the imprisonment terms for possessing an instrument of crime and possession of a firearm by a prohibited which the court appeared

*(Footnote Continued Next Page)*

Appellant timely filed a post-sentence motion that the trial court denied on August 9, 2023. **See** Post-Sentence Motion, 8/7/23, 1-4; Order (denial of post-sentence motion), 8/9/23, 1. Appellant thereafter timely filed a notice of appeal and a court-ordered concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). **See** Notice of Appeal, 8/23/23; Order (Rule 1925(b)), 10/3/23; Rule 1925(b) Statement, 10/27/23. With leave of court, he also filed a supplemental Rule 1925(b) statement on October 27, 2023. **See** Supplemental Rule 1925(b) Statement, 10/27/23; Order (granting leave for supplemental Rule 1925(b) statement), 11/1/23. Appellant's appeal was dismissed due to his failure to file a docketing statement pursuant to Pennsylvania Rule of Appellate Procedure 3517. **See** Superior Court Order (dismissal), 10/30/23, 1 (2184 EDA 2023). After Appellant filed an unopposed post-conviction petition for collateral relief, the trial court, sitting as the post-conviction court, reinstated Appellant's direct appeal rights *nunc pro tunc* on February 14, 2024. **See** Unopposed Post-Conviction Petition, 2/6/24; Order (direct appeal rights

---

to designate as terms consecutive to the imprisonment term for the first count of assault of a law enforcement officer.

Even though the service-of-term designations on the sentencing order could not logically add up to an aggregate term of twenty-five to fifty years' imprisonment in their current state, the sentencing order suggested that was the aggregate term that the court wished to impose. **See** Order (sentencing), 7/31/23, 1 ("The aggregate period of confinement is a term not less than 25 years and not more than 50 years.") (years notations handwritten in form sentence).

reinstatement), 2/14/24. The instant appeal was initiated by a timely notice of appeal that Appellant subsequently filed. **See** Notice of Appeal, 3/11/24, 1.

Appellant presents the following questions for our review:

[I.] Was the Commonwealth's evidence insufficient to convict Appellant of [C]ounts 13, 14, and 15 of the criminal information, charging assault of a law enforcement officer under 18 Pa.C.S. § 2701.1(a), when the evidence failed to establish that Appellant attempted and/or specifically intended to cause bodily injury to the law enforcement officers associated with these counts?

[II.] Did the trial court err in denying Appellant's motion to dismiss pursuant to Pa.R.Crim.P. 600(D)(1) by incorrectly determining the adjusted run date in his case?

Appellant's Brief, 5 (suggested answers and unnecessary capitalizations omitted).

In his first issue, Appellant challenges the sufficiency of the evidence supporting his three convictions for assault of a law enforcement officer. **See** Appellant's Brief, 18-23. He asserts that the evidence failed to prove that he attempted or specifically intended to harm the law enforcement officers by discharging a firearm. **See id.** at 18. He thus claims that the Commonwealth failed to prove his "specific intent to shoot a particular officer in the vicinity of where the fourth shot was fired." **Id.** at 20. In support of this claim he asserts that, "because of [the officers'] concealment, the time that elapsed between [the gun] shots, the lack of light in the area, and other uncertainties surrounding this issue of fact, it was unclear whether [he] was aware that

- 13 -

officers were in the area where the shots were fired." *Id.* He based his supposed lack of intent on the fact that none of the officers were wounded by the fourth shot. *See id.* at 22-23 ("He could have lined up a shot and fired on any number of officers assembled outside his residence that night. He did not."). He admits that his conduct of firing in the direction of the officers "was extremely reckless and dangerous," but asserts that the evidence "did not establish an attempt or specific intent to harm a law enforcement officer with a firearm." *Id.* at 23.

"Evidentiary sufficiency is a question of law and therefore, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Muhammad*, 335 A.3d 1047, 1051 (Pa. 2025) (citation omitted). We employ the following well-settled standard of review when analyzing claims challenging the sufficiency of the evidence:

> the standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the

- 14 -

evidence produced, is free to believe all, part[,] or none of the evidence.

**Commonwealth v. Marberger**, --- A.3d ----, 2025 WL 2434640, *4 (Pa. Super. 2025) (citation omitted; brackets in original).

Appellant's convictions for assault of a law enforcement officer were committed against Patrolmen Klinger, Steckeni, and Gilmore, who were in the vicinity of where the fourth gunshot struck the tire and undercarriage of a marked police vehicle. **See** Verdict Sheet, 4/12/23, 1; N.T. Trial, 4/11/23, 35, 40-41, 57, 81, 87, 90, 131-32. For those charges, the Commonwealth needed to prove that:

> (1) the defendant attempted to cause, or intentionally or knowingly caused, bodily injury[;] (2) the victim was a law enforcement officer acting in the performance of his duty[;] (3) the defendant had knowledge the victim was a law enforcement officer[;] and (4) in attempting to cause, or intentionally or knowingly causing such bodily injury, the defendant discharged a firearm.

**Commonwealth v. Landis**, 48 A.3d 432, 445 (Pa. Super. 2012) (*en banc*); **see** 18 Pa.C.S. § 2702.1(a) ("A person commits a felony of the first degree who attempts to cause or intentionally or knowingly causes bodily injury to a law enforcement officer, while in the performance of duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm.").

As none of the officers in this case were wounded by Appellant, the evidence had to prove an attempt to cause bodily injury to sustain the convictions at issue. Section Pa.C.S. § 901(a) of the Crimes Code defines an attempt as "when, with intent to commit a specific crime, [a person] does any

act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a); *Landis*, 38 A.3d at 446 (utilizing Section 901(a)'s definition for attempt when evaluating the sufficiency of the evidence for a *prima facie* case for assault of a law enforcement officer in a case involving the discharge of a firearm upon a law enforcement officer where no injury was inflicted). In *Landis*, we noted that "criminal attempt under Section 2702.1 requires a showing of some act, albeit not one actually causing bodily injury, accompanied by an intent to inflict bodily injury upon a law enforcement officer by discharging a firearm." *Landis*, 38 A.3d at 446.

With respect to defining the necessary *mens rea* for a criminal attempt, the *Landis* Court relied on Section 302 of the Crimes Code, which defines "intentionally" as follows:

§ 302. **General requirements of culpability**

**\*\*\***

**(b) Kinds of culpability defined.—**

   (1)   A person acts intentionally with respect to a material element of an offense when:

      (i)   if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

      (ii)   if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

*Landis*, 38 A.3d at 446 (quoting 18 Pa.C.S. § 302(b)(1)(i)-(ii) (bold in original).

As our Court has previously stated with regard to proving intent for criminal attempt:

> An intent is a subjective frame of mind, it is of necessity difficult of direct proof[.] [W]e must look to all the evidence to establish intent, including, but not limited to, the defendant's conduct as it appeared to his eyes[.] Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances.

*Commonwealth v. Alford*, 880 A.2d 666, 671 (Pa. Super. 2005) (citation omitted; alterations in original).

In the instant claim, Appellant fails to review the record in the light most favorable to the Commonwealth as the verdict winner – as required by our standard review – as he argues that the evidence failed to prove his *mens rea* for an attempt to cause bodily injury with respect to the fourth shot fired in the standoff addressed at his trial. Most notably, he fails to mention in his sufficiency analysis that, before and after he fired the first of the gunshots in the presence of the responding police patrolmen, who identified themselves as police officers to him, he made threats to shoot or kill the patrolmen if they did not leave his property. *See* N.T. Trial, 4/11/23, 73 (upon the officers' arrival, Appellant told them, "If yo[u] don't get off my property, I'm going to shoot the shit out of you guys"); *id.* at 34, 59 (after the first shot was fired, Appellant told the officers, "Get the fuck off my area, I'm going to kill you guys"). Moreover, he does not discuss the fact that his third gunshot, fired

about twenty minutes before the fourth shot, which was the basis for the assault of a law enforcement officer convictions, was close enough that it caused debris to hit the back of the head of an additional patrolman at the scene. *See* N.T. Trial, 4/11/23, 98.

Here, the trial court sitting as the fact finder concluded that the fourth gunshot was committed with an intent to cause bodily injury to the officers in the vicinity of where that shot was fired. *See* Trial Court Opinion, 8/13/24, 4-5 ("[Appellant] not only fired shots, but also made clear his intention to do so, by threatening to shoot the officers if they did not get off his property."). Viewing the evidence under the controlling standard of review, the court's conclusion as to the *mens rea* element for the assault of a law enforcement officer convictions does not appear to have been based on an unreasonable inference. The fourth shot, as addressed in the officers' testimony and the diagram admitted as Trial Exhibit C-4, was demonstrated to have struck the tire and undercarriage of the vehicle in between Patrolman Steckeni on one side of the vehicle and Patrolmen Gilmore and Klinger on the other side. *See* N.T. Trial, 4/11/23, 40-41, 57, 81, 87, 90, 97, 131-32; Commonwealth Exhibit C-4. The trajectory of the fourth shot and the close proximity of the unwounded patrolmen when considered in combination with Appellant's prior verbal threats to kill or shoot the officers if they did not leave his property and the earlier third shot that was close enough to an officer to cause debris to land on Patrolman Gaspari's head support the reasonable conclusion that

Appellant was following through on his threat to shoot or kill the patrolmen when he fired his fourth shot.

In **Landis**, our Court, sitting *en banc*, quoted an earlier Pennsylvania Supreme Court case when it noted that "[a] gun is a lethal weapon; pointing it towards a person, and then discharging it, speaks volumes as to one's intentions." **Landis**, 48 A.3d at 447 (quoting **Commonwealth v. Hall**, 830 A.2d 537, 543 (Pa. 2003)). In this case, the fact that Appellant went from firing two possible warning shots, to firing a shot that was near an officer, and then fired a shot that whizzed between multiple officers, missing them only by a matter of a few feet from a distance, spoke volumes about his intentions when each shot he fired increased the danger to the officers. Where he fired upon them after they did not leave the area of his home – consistent with his threats – it was a perfectly reasonable inference for the fact finder to conclude that, at a minimum, Appellant was firing the fourth gunshot with the intent to cause bodily injury to the officers in the immediate area where that projectile struck a marked patrol car. Appellant's stated threats provided ample evidence to sustain the *mens rea* element for the assault of a law enforcement officer convictions. **See Commonwealth v. Martuscelli**, 54 A.3d 940, 949-50 (Pa. Super. 2012) (holding evidence sufficient for assault of law enforcement officer where, *inter alia*, before Martuscelli fired bullets near police officers taking cover in a tree line, he made statements indicating he was suicidal and intended to shoot as many police officers as possible).

In the second issue presented, Appellant asserts that the trial court erred by denying his pre-trial motion to dismiss his case pursuant to Rule 600. *See* Appellant's Brief, 24-31. In particular, he alleges that the trial court "relied on an erroneous determination of the adjusted run date that was based on the wrong end date for excludable time resulting from the Delaware County Court of Common Pleas' pandemic-related shutdown." *Id.* at 26-27. He suggests that the excludable time related to the trial court's pandemic-related shutdown concluded in Delaware County as of July 19, 2021, rather than on August 31, 2021, as determined by the trial court in ruling that Appellant's Rule 600 motion was premature. *Id.* 26-28. In support of his argument, he relies on our opinion in *Commonwealth v. Faison*, 297 A.3d 810 (Pa. Super. 2023). *See* Appellant's Brief, 29-31.

The trial court's contemporaneous ruling on the Rule 600 motion does not appear of record. *See* Trial Court Opinion, 8/13/24, 5 ("This Court issued an [o]rder [on the Rule 600 motion] from the bench at a later listing. This Court has been unable to locate a copy of a signed order…"). In its Rule 1925(a) opinion, the trial court explains its reason for the denial of the motion as follows:

> [T]his Court notes that [Appellant's m]otion inaccurately noted the duration of the Covid-19 [e]mergency, indicating that it was lifted on July 19, 2021. Pursuant to the Order Vacating of the Thirty-Second (32nd — Delaware County) Judicial District's Past Declared Emergency of August 12, 2021, this [c]ourt's past emergency declaration, as extended, was to be vacated at the close of business on August 31, 2021. As such, an additional 43 days were excludable due to the Covid-19 [e]mergency.

* * *

> [Appellant's] Rule 600 [m]otion argues [for] an adjusted mechanical run date of August 3, 2022. Since [Appellant's] alleged adjusted mechanical run date was based on the erroneous calculation of the Covid-19 [e]mergency being lifted on July 19, 2021, which is 43 days short of the actual lifting date of August 31, 2021; if 43 days I added to [Appellant's alleged adjusted mechanical run date of August 2, 2022, the corrected adjusted mechanical run date would be September 15, 2022. September 15, 2022 is after the September 9, 2022, date that the [m]otion was filed.
>
> This [c]ourt did not err in denying the motion, as even absent analysis of further excludability of time between December 23, 2019[,] and the filing of the motion on September 9, 2022, the mechanical run date would not have occurred until after the date of filing. No further Rule 600 [m]options were filed in this matter between the September 9, 2022 filing and the bench trial held.

*Id.* at 5-6.

We review the denial of a motion for dismissal under Rule 600 for an abuse of discretion. *See Commonwealth v. Hunt*, 858 A.2d 1234, 1238 (Pa. Super. 2004) (*en banc*). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused." *Id.* (citation omitted). When reviewing a challenge to a trial court's ruling on a Rule 600 motion we are mindful that:

> Rule 600 has the dual purpose of both protecting a defendant's constitutional speedy trial rights and protecting society's right to effective prosecution in criminal cases. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective

prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it.

***Commonwealth v. Speed***, 323 A.3d 850, 855 (Pa. Super. 2024) (quoting

***Commonwealth v. Womack***, 315 A.3d 1229, 1237 (Pa. 2024) (formatting

modified; citations omitted)). "[O]ur scope of review is limited to the trial

court's findings and the evidence of record, viewed in the light most favorable

to the prevailing party." ***Womack***, 315 A.3d at 1237 (internal citation

omitted).

Rule 600 mandates, in relevant part, the following:

[(A)](2)  Trial shall commence within the following time periods.

> (a)  Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

**\*\*\***

(C) **Computation of Time**

(1)  For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of time within which trial must commence. Any other periods of delay shall be excluded from the computation.

**\*\*\***

(D) **Remedies**

(1)  When a defendant has not been brought to trial within the time periods set forth in paragraph (A), at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated. A copy of the motion shall be

> served on the attorney for the Commonwealth concurrently with the filing. The judge shall conduct a hearing on the motion.

Pa.R.Crim.P. 600(A)(2)(a), (C)(1), (D)(1).

> Our review of a Rule 600 dismissal claim requires a three-step analysis:
>
> First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600([D]). As we have explained, Rule 600[] encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date. Addition of any Rule 600[] extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.

*Commonwealth v. Carl*, 276 A.3d 743, 749 (Pa. Super. 2022) (citation omitted).

In this case, the Commonwealth filed its criminal complaint against Appellant on December 23, 2019, and Appellant filed his Rule 600 dismissal notice on September 9, 2022. At the time he filed the motion, Appellant reasoned that his adjusted run date had elapsed on August 3, 2022. *See* Rule 600 Motion, 9/9/22, ¶ 18. Within the 991 days from the filing of the complaint and filing of the Rule 600 motion, Appellant agreed in his motion that 588 days were excludable and extended the mechanical run date, including: (1) five days between March 11-16, 2020, due to a lack of defense counsel, *see*

*id.* at ¶ 11; (2) 490 days between March 16, 2020, and July 19, 2021, consisting of COVID-19 pandemic-related delay during state and local judicial emergencies, *see id.* at ¶ 12; (3) forty-two days between March 14, 2022, and April 25, 2022, during which he "waived" the delay period for Rule 600 purposes, *see id.* at ¶ 17; and (4) fifty-one days between April 25, 2022, and June 15, 2022, which was excludable due to Appellant's filing and withdrawal of a motion to suppress evidence, *see id.* at ¶ 18. Adding these 588 days of conceded excludable time to the original mechanical run date of December 23, 2020, results in Appellant's adjusted run date of August 3, 2022. The only time-period at issue for our review in the instant claim is the period between July 19, 2021, and August 31, 2021, which Appellant claims exceeded the judicial emergency period during the Covid-19 pandemic and which the trial court regarded as within the excludable emergency period.[5]

Beginning on March 16, 2020, our Supreme Court declared a statewide judicial emergency until April 14, 2020, "to safeguard the health and safety of court personnel, court users, and members of the public due to the circumstances surrounding the COVID-19 virus." ***See In re General***

---

[5] Consistent with our Supreme Court's opinion in ***Commonwealth v. Lear***, 325 A.3d 552 (Pa. 2024), our review of the extent of the judicial emergency in Delaware County does not involve any issue with respect to the due diligence of the Commonwealth during the period at issue. ***See id.*** at 563 (holding that pre-trial "delays caused by the COVID-19 pandemic-related emergency court closures and restrictive measures" constituted "other periods of delay" under Pa.R.Crim.P. 600(C)(1)).

***Statewide Judicial Emergency***, 228 A.3d 1283, 1283 (Pa., filed Mar. 18, 2020) (table). Along with that declaration, the Supreme Court issued orders suspending the computation of time rule at Rule 600(C) during the period of the statewide judicial emergency. ***See id.*** at 1287. When the statewide judicial emergency ended, our Supreme Court expressly empowered each judicial district's president judge to enter self-effectuating declarations of judicial emergency, which could "[s]uspend statewide rules pertaining to the rule-based right of criminal defendants to a prompt trial." ***In re General Statewide Judicial Emergency***, 234 A.3d 408, 409 (Pa., filed May 27, 2020) (table).

In light of the Supreme Court's statewide judicial emergency orders, the Honorable Kevin F. Kelly, President Judge of the Court of Common Pleas of Delaware County, issued a series of orders extending the judicial emergency in the Thirty-Second Judicial District, which is comprised of Delaware County. In ***Commonwealth v. Faison***, 297 A.3d 810 (Pa. Super. 2023), upon evaluating a Rule 600 dismissal claim in a Delaware County criminal matter, we noted that the defendant in that case did not dispute "the fact that the President Judge of Delaware County extended the judicial emergency several times and suspended jury trials until July 19, 2021." ***Id.*** at 824 (emphasis omitted). Accordingly, we agreed that the delay in that case from March 16, 2020, until July 19, 2021, was excludable for Rule 600 purposes. ***Id.*** Appellant, in the instant case, relies on this demarcation used

in **Faison** to determine the end of the Delaware County local judicial emergency for purposes of his own Rule 600 claim.

In **Faison**, however, we did not make a determination as to the end date of the local judicial emergency in Delaware County for purposes of Rule 600. Instead, we merely reviewed whether the period from March 16, 2020, until July 19, 2021, was excludable as that was the focus of the parties and the trial court in that case. **See Faison**, 297 A.3d at 824 ("[Faison] does not dispute the fact that the President Judge of Delaware County extended the judicial emergency several times and suspended jury trials until July 19, 2021. Both the Commonwealth and trial court insist that this period of time – from March 16, 2020, until July 19, 2021 – is excluded from the time calculations of Rule 600. We agree.") (citation and emphasis omitted). Our review of the emergency orders of the President Judge of Delaware County comport with the assessment of the trial court in the instant case that the local judicial emergency extended to August 31, 2021, for Rule 600 purposes.

Pursuant to the President Judge's Sixth Emergency Order Extension, dated July 2, 2021, "attached criminal section operational and/or revised scheduling protocols reflecting the court of common pleas' criminal section transition to post-pandemic business process" became effective on July 19, 2021, and "continue[d] through and including" August 31, 2021. **See In re: Thirty-Second Judicial District – Sixth Emergency Order Extension – Criminal Section**, P.J. Kelly, 7/2/21, 1, available at

https://www.delcopa.gov/sites/default/files/2024-12/SixthEmergencyExtensionOrder_CriminalSection.pdf. The order did not declare an end to the emergency on July 19, 2021, as Appellant suggests. Instead, it anticipated a return to pre-pandemic operations of the criminal section on the week beginning September 7, 2021, with the attached scheduling protocols declaring a resumption of criminal jury trials as of July 19, 2021, with scheduling limitations set forth as to the various sitting judges. *See id.* at 1 n.3 and attached Scheduling Protocols, 7/2/21, 4. As the Commonwealth notes in its brief, the period beginning on July 19, 2021, "was not a full return to court function, but was instead a limited testing and transition period," and we agree with that interpretation of the July 2, 2021 emergency extension order. *See* Appellee's Brief, 15 n.2.

On August 12, 2021, President Judge Kelly issued an order vacating the Delaware County Criminal Section's emergency operational and scheduling protocols as of the close of business on August 31, 2021. *See In re: Thirty-Second Judicial District – Vacating of the Criminal Section Emergency Operational and Scheduling Protocols*, P.J. Kelly, 8/12/21, 1, available at https://www.delcopa.gov/sites/default/files/2025-04/OrderVacatingOfTheCriminalSectionEmergencyOperationalAndSchedulingProtocols.pdf. The vacation of the emergency operational and scheduling protocols in place during the local judicial emergency appeared to mark the end of the local judicial emergency as of August 31, 2021.

Prior to the issuance of the sixth emergency extension order for the Criminal Section of the Court of Common Pleas of Delaware County on July 2, 2021, and the apparent end of the local judicial emergency at the close of business on August 31, 2021, Appellant's trial date was rescheduled from June 25, 2021, to October 12, 2021. **See** Criminal Notice Form, 6/25/21, 1. Given the timing of the last extension of the local judicial emergency and the trial court's rescheduling of the trial date on June 25, 2021, the entire period from March 16, 2020, until October 12, 2021, was excludable time for Rule 600 purposes where the Commonwealth had no control over the trial court's calendar or its ability to accommodate an earlier date. **See Lear**, 325 A.3d at 563 (finding the time from the suspension of Rule 600 in March 2020 to the first scheduled triage conference after jury trials resumed constituted an "other period[ ] of delay," and therefore was excluded from the Rule 600 computation) (alteration in original). **See also Commonwealth v. Holt**, 175 A.3d 1014, 1022 (Pa. Super. 2017) ("Therefore, because there is no indication in the record that the Commonwealth requested this length of time in which to bring Appellant to trial, and the delay occurred despite its due diligence," the delay was excludable for purposes of Rule 600, distinguishing it from time attributable to the normal progression of the case).

If Appellant's trial date had been rescheduled for a time during the "limited testing and transition period," beginning on July 19, 2021, the pandemic-related delay would have been deemed to have concluded earlier

than the official end of the local judicial emergency. ***See, e.g., Commonwealth v. Hamilton***, 2025 WL 2049036, \*5 (Pa. Super., filed July 22, 2025) (holding, in a Delaware County criminal matter, that the time from the limited resumption of jury trials on July 19, 2021, to the defendant's first scheduled appearance after the resumption of jury trials, on August 3, 2021, was excludable time) (cited for persuasive value pursuant to Pa.R.A.P. 126(b)(2)). Consistent with ***Lear***, ***Holt***, and ***Hamilton***, we conclude that the excludable time related to the COVID-19 pandemic in Appellant's case lasted until his first scheduled appearance after the resumption of jury trials in Delaware County which occurred on October 12, 2021, amounting to a 575-day delay due to the COVID-19 judicial emergency.

With Appellant's concession to 98 days of other excludable time periods, ***see*** Rule 600 Motion, 9/9/22, ¶ 18, and properly adding the 575-day period of excludable time related to the pandemic, there was a total of 673 days of excludable time. Adding those days to the original mechanical run date of December 23, 2020, yielded an adjusted run date of October 27, 2022. Here, Appellant's Rule 600 dismissal motion was filed well before that date on September 9, 2022. Accordingly, Appellant's Rule 600 motion was premature, and Appellant did not have a valid Rule 600 claim at that time. As a result, the trial court properly exercised its discretion his denying his motion to dismiss based on Rule 600. ***See Commonwealth v. Hyland***, 875 A.2d 1175,

1191 (Pa. Super. 2005) ("Appellant did not have a valid Rule 600 motion when he filed it; in fact, the motion was premature.").

Although we find that Appellant has failed to demonstrate an entitlement to relief with respect to his challenges to the sufficiency of the evidence and the denial of his Rule 600 dismissal motion, we are unable to conclude our review based simply on the denial of the claims presented. During our examination of the record for this case, we noticed obvious and patent errors in Appellant's sentencing order which require additional action by the trial court.

As addressed above in our procedural history review, *see supra* at 10 n.4, there are multiple inconsistencies in the sentencing order that make it impossible to enforce. While the trial court indicated in the order that it was imposing an aggregate imprisonment term of twenty-five to fifty years, *see* Order (sentencing), 7/31/23, 1, the individual terms of imprisonment for the various convictions do not clearly add up to that aggregate term. The court imposed concurrent terms of twenty to forty years' imprisonment for the three counts of assault of a law enforcement officer, with the sentence for Count 14 to be served concurrently with the term for Count 13, and the sentence for Count 15 to be served concurrently with both terms for Count 13 and 14. *See id.* at 1. The court also imposed one-to-two-year imprisonment terms for all three counts of aggravated assault to be served concurrently with the concurrent terms for assault of a law enforcement officer. *See id.* at 1-2

(imposing one to two years' imprisonment for aggravated assault at Count 5 to be served concurrent with Counts 13-15, imposing one to two years' imprisonment for aggravated assault at Count 6 to be served concurrent with Counts "13-15 and 5," and imposing one to two years' imprisonment for aggravated assault at Count 7 to be served concurrent with Counts "13-15 and 5-6"). The resulting aggregate term for just those sentences was twenty to forty years' imprisonment. The problem with reaching the stated aggregate sentence lies with the sentence terms on the remaining convictions.

The sentencing order included a term of two and one-half to five years' imprisonment for possessing an instrument of crime at Count 23, but the trial court designated that term to be simultaneously served consecutive to the imprisonment term for Count 13 and concurrent with the imprisonment terms for Counts "14-15, [and] 5-7," even though the prison terms for Counts 5-7 and 13-15 were all designated to be served concurrently. **See** Order (sentencing), 7/31/23, 1-2. The two-and-one-half-to-five-year prison term for possession of a firearm by a prohibited person at Count 24 exhibited the same problem: it was noted to be served consecutive to the term for Count 13, and concurrently with Counts "14-15, [and] 5-7," even though the terms for Counts 5-7 and 13-15 were all designated to be served concurrently. **See** **id.** at 1-3. Compounding those issues, the sentencing order does not indicate how the sentences for Counts 23 and 24 are designated to be served in relation to each other. If they were designated to be served consecutive to

each other, with one of them being designated to be served consecutive to Counts 13-15, that would complete the apparently intended sentencing scheme of an aggregate twenty-five-to-fifty-years' imprisonment, but the order does not state as much. Instead, one could guess that they are implicitly designated to be served concurrently with each other because they are both designated to be served consecutive to the prison term for Count 13.

As stated in the sentencing order, however, the individual terms do not add up to the stated aggregate.[6] It thus appears that the order includes multiple obvious and patent errors which can be corrected by the trial court at this juncture. *See Commonwealth v. Holmes*, 933 A.2d 57, 65-67 (Pa. 2007) (holding that trial courts possess the inherent power to correct the "obvious and patent errors" in their original orders, even absent "traditional jurisdiction" over their cases; "the inherent power to correct errors does not extend to reconsideration of a court's exercise of sentencing discretion …

---

[6] The failure in the sentencing order to specify that the prison term on Count 24 would be served consecutive to the prison term on Count 23, which would have supported the stated aggregate term, also appears in the trial court's oral pronouncement of its sentence:

> On Count 23, Possession of an Instrument of Crime, misdemeanor of the first degree, 2-1/2 to 5 years. This is consecutive to Count 13, concurrent with all other counts, Counts 14 and 15 and 5 to 7. On Persons Not to Possess, Count 24, misdemeanor of the first degree, 2-1/2 to 5 years. This Is consecutive to Count 13, concurrent to all other counts, Count 14 and 15 and 5 to 7.

*See* N.T. Sentencing Hearing, 7/31/23, 25.

These cases involve clear errors in the imposition of sentences that were incompatible with the record"). Accordingly, we will remand to allow the trial court to issue a new, corrected sentencing order and affirm the judgment of sentence in all other respects. ***See, e.g., Commonwealth v. Umoh***, 311 A.3d 24, 34 (Pa. Super. 2024) (*sua sponte* remand for correction of a sentencing order that listed the defendant's contempt conviction as a violation under an incorrect statute number).

Case remanded for correction of patent and obvious errors in sentencing order. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/23/2025